# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: | Chapter 11 |
| Georgetown Steel Company, LLC | C/A No. 03-13156-W |
| Debtor. | Adv. Pro. No. 03-80571 |
| Georgetown Steel Company, LLC, | **ORDER** |
| Plaintiff, | |
| v. | |
| Progress Rail Services Corporation, | |
| Defendant. | |

This matter comes before the Court upon cross Motions for Summary Judgment filed by Georgetown Steel Company, LLC ("Georgetown Steel" or "Debtor") and Progress Rail Services Corporation ("Progress Rail" or "Defendant"). The controversy in this matter is the determination of which party is entitled to the proceeds of certain inventory that was in Debtor's possession on the date of the bankruptcy filing. After examining the record of the case and considering the arguments of counsel, the Court believes that before it can rule on the ultimate issue of which party is entitled to the proceeds of the inventory, it must first determine the nature of the transaction between the Debtor and Progress Rail. After reviewing the parties' pleadings and arguments, the Court makes the following findings of fact and conclusions of law relating to the nature of the transaction between the Debtor and Progress Rail.[1]

---

[1] This Order is a preliminary order to establish the nature of the transaction between Debtor and Progress Rail; the Court will issue a separate order addressing the applicable remedies of the parties and determining which

## FINDINGS OF FACT

1. Hot briquetted iron, also known as HBI in the steel industry, is a raw material commodity used in the production of steel. Debtor processed HBI in order to produce steel.

2. Progress Rail supplied HBI and other raw materials to Debtor.

3. On October 10, 2003, Debtor and Progress Rail entered into an agreement titled "Consignment Agreement" (the "Agreement").[2]

4. During the period between October 10, 2003 and October 20, 2003, Progress Rail delivered HBI to Debtor at its facility in Georgetown, South Carolina as required by the Agreement.

5. Pursuant to the terms of the Agreement, Progress Rail maintained title to the HBI delivered to Debtor. Debtor stored the HBI in a segregated location from its other inventory, and removed and used the HBI from the location on an as-needed basis. Once a week Debtor reported the HBI usage to Progress Rail and paid Progress Rail for the HBI that it consumed during the prior week.

6. The parties do not dispute that Progress Rail did not file a UCC-1 financing statement to evidence its interest in the inventory of HBI in Debtor's possession.

7. It is also undisputed that on October 20, 2003, Progress Rail sent a written notice to Debtor stating that it was terminating the Agreement and sent an additional written notice demanding reclamation of certain goods in Debtor's possession. Progress Rail's written notice terminating the Agreement advised Debtor that the Agreement was to be terminated effective

---

party is entitled to the proceeds of the sale of the subject inventory.
[2] Under the terms of the Agreement, Debtor and Progress Rail agreed that Alabama state law governed the construction and enforcement of the Agreement.

2

October 21, 2003, and Debtor was directed to immediately stop withdrawing and consuming HBI.[3]

8.  Progress Rail's reclamation demand provided that the demand was for all goods received by Debtor from Progress Rail within the applicable reclamation period, regardless of whether such goods were included in the exhibit to the reclamation demand.

9.  On October 21, 2003 (the "Petition Date"), Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Debtor is operating its business and managing its properties as debtor-in-possession pursuant to Sections 1107(a) and 1108 of title 11 of the United State Code, 11 U.S.C. §101, et seq. (the "Bankruptcy Code").

10.  After the Petition Date, Debtor no longer had an immediate use for the HBI because of the closure of the mill.

11.  On the Petition Date, the CIT Group/Business Credit Inc. ("CIT") claimed a first priority perfected security interest in Debtor's entire inventory, including the HBI, based on its loan documents with Debtor and as further set forth in the Cash Collateral Orders entered by the Court in the bankruptcy case. MidCoast Industries, Inc. ("MidCoast") claimed a second perfected security interest in Debtor's inventory.[4]

12.  After the Petition Date, Debtor and Progress Rail entered into a Stipulation (the "Stipulation"), which provided for the sale of HBI in Debtor's possession. Both Debtor and Progress Rail wanted to liquidate the inventory of HBI because the market price of HBI at that time was high and was expected to decrease in the near future.

---

[3] The submission of the termination letter and reclamation demand does not control the determination of what type of Agreement the parties entered into, but may be relevant for purposes of a subsequent determination of who is entitled to the proceeds of the sale of the HBI.

[4] Debtor acknowledges the claims of CIT and MidCoast Industries, Inc. have now been paid or otherwise satisfied from other resources of the Debtor.

3

13. Furthermore, the Stipulation provided that this Court would resolve all claims and disputes concerning ownership of the proceeds generated by the sale of the HBI. Moreover, Debtor and Progress Rail also agreed that the sale would not affect any party's interest in the HBI and that any interest in the HBI would attach to the proceeds produced from the sale.

14. The HBI was sold in December 2003 pursuant to the terms of the Stipulation. The sale of the HBI generated $1,381,435.01 in proceeds. The proceeds of the sale are currently being held in trust pending the outcome of this adversary proceeding.

15. On December 22, 2003, Debtor filed a Complaint seeking a declaratory judgment that Debtor's interest in the HBI is superior and senior to Progress Rail's interests in the HBI and asserting its rights as a lien creditor pursuant to 11 U.S.C. § 544.

16. Debtor contends that the Agreement is a consignment pursuant to Article 9 of the Uniform Commercial Code ("UCC") as enacted by the state of Alabama under Title 7 of the Alabama Code (the UCC provisions enacted under Title 7 of the Alabama Code shall generally be referred to as the "Alabama Commercial Code"). However, Progress Rail contends that the Agreement represents a sales transaction governed by the provisions of Article 2 of the Alabama Commercial Code.[5] In light of the parties' competing views, the Court must determine which alternative best describes this transaction.[6]

## CONCLUSIONS OF LAW

The question before the Court, as stipulated by the parties, is whether the Agreement is a consignment governed under Article 9 of the Uniform Commercial Code (Article 9A of Title 7

---

[5] To the extent Progress Rail argued at the hearing that the transaction between it and Debtor was of another type, such as a common law consignment or a consignment not within the purview of Article 9, because it fails to meet the technical definition of a consignment provided in Article 9, Progress Rail appears to have abandoned that position by failing to brief the matter in its proposed order, instead relying on the argument that the transaction is a sale under Article 2.

[6] The parties have agreed that there are no genuine issues of material fact for purposes of the issues addressed in this Order.

of the Alabama Code) or is more in the nature of a sale or transaction in goods in which Article 2 expressly applies.

I.  **ARTICLE 9 CONSIGNMENT**

Prior to the 1999 revisions to the UCC, most of the law concerning consignment transactions was governed by Article 2 of the UCC. Following the revisions, most provisions governing consignments are now contained in Article 9. White & Summers, Uniform Commercial Code, § 30-4 (5th ed., 2002); Official Comment 4 to ALA. CODE § 7-2-326. Additionally, the definition of a "security interest" under the revised UCC now includes an interest of a consignor pursuant to Article 9. See id.; UCC § 1-201(37); ALA. CODE § 7-1-201(37) (West, WESTLAW through 2004 Legis. Sess.). Alabama has adopted the 1999 revisions to the UCC.[7]

In order to determine whether the Agreement is a consignment governed by Article 9, it is necessary to examine whether the transaction between Debtor and Progress Rail meets the definition of consignment under the Alabama Commercial Code. If the transaction falls outside the definition, it is likely governed by Article 2. See White & Summers, Uniform Commercial Code, § 30-4 (5th ed., 2002).

Section 7-9A-109 of the Alabama Commercial Code states that Article 9A (Alabama's enactment of revised 1999 version of Article 9 of the UCC) applies to:

---

[7] Prior to 1999, Ala. Code § 7-2-326(3)(1992) governed consignment transactions. Courts at that time examined consignment transactions to determine whether a particular transaction could be deemed a "sale or return" in order to determine the priority of interest in the consigned goods as between a consignor and the consignee's secured creditors. See McGregor v. Jackson (In re Auclair), 131 B.R. 185 (Bankr. M.D. Ala. 1991). See also Murphy v. Southtrust Bank of Alabama, N.A., 611 So.2d 269 (Ala. 1992); General Electric Credit Corp. v. Strickland Div. of Rebel Lumber Co., 437 So.2d 1240 (Ala. 1983); Bishoff v. Thomasson, 400 So.2d 359 (Ala. 1981); First Nat'l Bank of Birmingham v. Young, 530 So.2d 834, 837 (Ala. Ct. App. 1988). This analysis included examining the aspects of a transaction such as (1) the consignor's delivery of possession to the consignee, (2) the fact that the consignee engages in the business of selling goods of the kind involved, and (3) the failure of the consignor to give public notice of his retained interest in the goods. Murphy v. Southtrust Bank of Alabama, N.A., 611 So.2d at 271 (citing Bishoff v. Thomasson, 400 So.2d 359 (Ala. 1981)). ALA. CODE § 7-2-326(1992) shall hereinafter be referred to as "former § 7-2-326." Further, UCC § 2-326 prior to the 1999 revision shall be referred to as "former UCC § 2-326."

5

> (1) a transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract; . . . [and]
> (4) a consignment.

ALA. CODE §§ 7-9A-109(a)(1) & (4) (West, WESTLAW through 2004 Legis. Sess.).

According to the changes in the Alabama Commercial Code, the provisions describing a consignment under former § 7-2-326(3) are now largely incorporated into the definition of consignment pursuant to ALA. CODE § 7-9A-102(a)(20). Section 7-9A-102(a)(20) of the Alabama Commercial Code defines a consignment as follows:

> "Consignment" means a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:
> (A) the merchant:
>    (i)   deals in goods of that kind under a name other than the name of the person making delivery;
>    (ii)  is not an auctioneer; and
>    (iii) is not generally known by its creditors to be substantially engaged in selling the goods of others;
> (B) with respect to each delivery, the aggregate value of the goods is $1,000 or more at the time of delivery;
> (C) the goods are not consumer goods immediately before delivery; and
> (D) the transaction does not create a security interest that secures an obligation.

ALA. CODE § 7-9A-102(a)(20) (West, WESTLAW through 2004 Legis. Sess.). In order to be a consignment agreement solely governed by Article 9A of the Alabama Commercial Code, the transaction at issue must fall within the definition set forth above. Debtor contends that the Agreement meets all of the elements of a consignment pursuant to ALA. CODE § 7-9A-102(a)(20). Progress Rail concedes that the transaction meets most of the above criteria but argues that the Agreement is not a consignment because (A) the goods were not delivered to a

6

merchant "for the purpose of sale"; (B) Debtor does not "deal in goods of that kind;" and (C) the Agreement creates a security interest that secures an obligation.[8]

### A. Did Progress Rail Deliver the HBI to Debtor "For the Purpose of Sale"?

The goods under a "consignment" transaction as defined by § 7-9A-102(a)(20) must be delivered "for the purpose of sale." The Agreement between Debtor and Progress Rail provides that title to the HBI shall remain with Progress Rail and that Debtor "[s]hall purchase [HBI] only for its own use." While there is no evidence indicating that Debtor sold HBI as a commodity to others, the Agreement contemplates the processing and incorporation of HBI into Debtor's manufactured steel products, which Debtor sells to its customers. Thus, the issue here is whether Debtor must sell HBI in its raw and unadulterated form to others in order to find that Progress Rail's delivery of HBI was "for the purpose of sale."

This issue is not new. When determining whether goods were delivered "for sale" under the provisions of former UCC § 2-326(3), the courts in Pearson Industries, Inc. and BFC Chemicals, Inc. rejected similar arguments to that made by Progress Rail in the matter before the Court. The court in Pearson Industries concluded that manufacturers selling component goods incorporated into products are delivered for sale as "component parts" of the product that the manufacturer sold to its customers. Barber v. McCord Auto Supply, Inc. (In re Pearson Industries, Inc.), 147 B.R. 914, 928 (Bankr. C.D. Ill. 1992). In addressing the same issue, the Court in BFC Chemicals, Inc. concluded that in order to apply former UCC § 2-326(3), debtor-consignee is not required to sell the raw form of goods delivered by a vendor for such goods to be delivered "for sale." BFC Chemicals, Inc. v. Smith-Douglass, Inc., 46 B.R. 1009, 1019 (E.D.N.C. 1985).

---

[8] Progress Rail does not dispute that Debtor is a merchant in its proposed order, thus the Court determines that Progress Rail has abandoned any such argument.

Further, the current version of the Alabama Commercial Code and commentary on the UCC lend support to Debtor's argument that the delivery was "for the purpose of sale." Official Comment 14 to ALA. CODE § 7-9A-102, the statutory provision that defines a "consignment," provides that:

> The definition of 'consignment' requires that goods be delivered 'to a merchant for the purpose of sale.' If the goods are delivered for another purpose as well, *such as milling or processing*, the transaction is a consignment nonetheless because a purpose of delivery is 'sale.'"

(emphasis added). Finally, the leading commentary on the Uniform Commercial Code contemplates transactions such as that between Debtor and Progress Rail and concludes:

> If despite their processing and commingling the goods are to be returned to the owner and not sold to a third person, the transaction is not a consignment under the 1999 Article 9 . . . . If, on the other hand, the goods are to be processed and then sold by the processor to persons to be selected by him, *the transaction is a consignment even though the processor is both processing and selling.*

White & Summers, Uniform Commercial Code, § 30-5 (5th ed., 2002) (emphasis added). In the matter before the Court, Debtor processed the HBI delivered by Progress Rail and incorporated the HBI into steel. The HBI is an integral component of the steel that Debtor sells to its customers. Therefore, this Court concludes that Progress Rail delivered HBI to Debtor "for the purpose of sale."

  B.  *Does Debtor "Deal in Goods of that Kind"?*

The Alabama Commercial Code does not specifically provide for the precise meaning of "dealing in goods of the kind." Additionally, the Court was unable to find, and the parties did not cite, Alabama case law specifically defining the phrase "deals in goods of the kind." However, a survey of other jurisdictions provided some measure of guidance. In Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 223 F.3d 873, 883-84 (8th Cir. 2000), the Eighth Circuit, in determining whether Minnesota's economic loss doctrine applied to a specific transaction,

8

addressed the issue of whether a manufacturer that incorporated a component good into its end product may be considered a merchant that deals in that particular component good. Under the facts of Marvin Lumber & Cedar Co., a manufacturer and seller of customized wooden windows and doors incorporated a wood preservative into his final products. In light of the manufacturer's expertise in selling the wooden products and incorporating the wood preservative into those products, the Eighth Circuit held that the manufacturer dealt in wood preservatives. Id. In so holding, the Eighth Circuit stated that "[w]here a manufacturer with sophisticated knowledge of a component purchases and incorporates that component into its product, the manufacturer is a [sic] not merely a dealer with respect to finished product, but with respect to the component part as well." Id.

In Pearson Industries, Inc., the debtor received tires and incorporated them into machinery that it manufactured and then sold. The vendor that supplied the tires argued that former UCC § 2-326, as adopted by the state of Illinois, did not apply to the transaction because the debtor did not sell the tires individually. The court in that case rejected the vendor's argument and concluded that debtor maintained a place of business at which it dealt with the tires delivered by vendor by incorporating the tires into the equipment that debtor manufactured and sold. The Court went on to conclude that despite the fact that debtor did not retail the component tires individually and apart from its manufactured product, former UCC §§ 2-326(2) & (3) applied nonetheless. 147 B.R. at 928.

In BFC Chemicals, as in this case, a debtor-consignee purchased goods from the creditor-consignor, processed and transformed the goods, and then resold the processed and transformed goods. 46 B.R. at 1019. The Court in BFC Chemicals noted that the goods that were the subject of the consignment agreement between debtor-consignee and creditor-consigner would normally

9

be in the inventory of a manufacturer such as the debtor-consignee. Notwithstanding the transformation of the purchased goods, the court in BFC Chemical held that the buyer dealt in the goods of the kind involved in the transaction. Id.

In this case, Debtor received the HBI from Progress Rail, and through its manufacturing process, combined it with other materials to produce steel. HBI is a processed metal used to manufacture Debtor's product and, in fact, is an integral component part of Debtor's final product. Moreover, HBI appears to be a raw material normally maintained in the inventory of manufacturers such as Debtor. Despite the fact that further processing of HBI is required to incorporate HBI into the steel that Debtor sells, HBI is a component of the steel produced and sold by Debtor; thus, it appears that Debtor deals in goods of the kind delivered by Progress Rail. Therefore, the Court finds that Debtor "deals in goods of the kind" for purposes of applying § 7-9A-102(a)(20) to the transaction between Debtor and Progress Rail.

    C.    *Did the Agreement Create a Security Interest "that Secures an Obligation?"*

In determining the last element of Article 9's definition of a consignment, a distinction can be made between a "conventional" commercial consignment - as defined in UCC § 9-102(a)(20) - and an "unusual" commercial consignment. See White & Summers, Uniform Commercial Code, § 30-4 (5th ed., 2002).[9] The "conventional" commercial consignment is also

---

[9] Pursuant to the UCC and Alabama Commercial Code, as previously cited, the definition of a "conventional" commercial consignment means a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:
    (A)    the merchant:
        (i)    deals in goods of that kind under a name other than the name of the person making delivery;
        (ii)    is not an auctioneer; and
        (iii)    is not generally known by its creditors to be substantially engaged in selling the goods of others;
    (B)    with respect to each delivery, the aggregate value of the goods is $1,000 or more at the time of delivery;
    (C)    the goods are not consumer goods immediately before delivery; and
    (D)    the transaction does not create a security interest that secures an obligation.

10

typically a security interest, while the "unusual" commercial consignment creates a security interest "that secures an obligation." Id. The latter is still treated under Article 9 (even though it does not meet part D of UCC § 9-102(a)(20)), but is restricted to the recovery rules set forth in Part 6 of Article 9. Id.[10]

Whether an interest "secures an obligation" has been described as dependent upon whether there is a duty to pay for unsold goods. Id. In the matter before the Court, it is clear that Debtor only owed Progress Rail a debt for the goods it consumed. The Agreement does not reference any accompanying broader debt or obligation Debtor owes to Progress Rail. Although the Agreement states, "[t]o the extent it may be necessary or appropriate under applicable law or regulation, [Debtor] grants [Progress Rail] a security interest in the [HBI]," the conditional nature of the language indicates that the terms of the Agreement do not create a clear and express grant of a security interest *that secures an obligation* in the HBI to Progress Rail. Thus, the Court concludes that the Agreement does not create a security interest that secures an obligation. Accordingly, the transaction meets all of the elements of the definition of a consignment set forth in § 7-9A-102(a)(20) of the Alabama Commercial Code.

## II. ARTICLE 2 SALE

In light of the cross motions filed by the parties, the Court will also consider Progress Rail's argument that the transaction is more in the nature of a sale. Progress Rail contends that the transaction between Debtor and Progress Rail was a sale by virtue of the "outwardly visible aspects of the transaction." Murphy v. Southtrust Bank of Alabama, N.A., 611 So.2d 269 (Ala. 1992). Progress Rail focuses on the language of the Agreement that provides that Debtor was

---

[10] In essence, if a transaction satisfies UCC § 9-102(a)(20) A through C, the consignor's interest is a security interest treated under Article 9. Those transactions that fall outside of the scope of 9-102(a)(20) by failing to satisfy 9-102(a)(20)A through C will likely be treated under revised Article 2-326(1). White & Summers, Uniform Commercial Code, § 30-4 (5th ed., 2002).

purchasing the HBI "only for its own use" and was not selling the HBI to a third party on behalf of Progress Rail. The Court has concluded earlier in this decision that such language does not render Article 9 inapplicable nor transform the Agreement to one outside of the definition of consignment pursuant to § 7-9A-102(a)(20).

Additionally, Progress Rail contends that Article 2 applies to transactions broader than the definition of a sale set forth in the ALA. CODE § 7-2-106 as "the passing of title from the seller to the buyer for a price."[11] Assuming that Article 2 is broad enough to cover transactions beyond the typical sales agreement, Progress Rail has not cited a single provision of Article 2 that would render the Agreement a sales transaction rather than a consignment as defined in Article 9.[12]

Even if Progress Rail's argument could be construed as contending that the transaction is a sale or return, which is outside of the definition of a consignment pursuant to Article 9, the Agreement does not meet the definition of a sale or return pursuant to ALA. CODE 7-2-326.[13] "In a 'sale or return' transaction, the buyer becomes the owner of the goods." Official Comment No. 6 to ALA. CODE § 7-9A-109. Therefore, a critical issue the Court must determine is whether Debtor became the owner of the HBI once Progress Rail delivered the HBI to Debtor's place of business.

Under the terms of the Agreement, Debtor was never the owner of the unconsumed HBI inventories that Progress Rail provided because Progress Rail retained title to all unconsumed HBI in the possession of Debtor. The only time Debtor became the owner of the HBI was <u>after</u>

---

[11] The Agreement provided that Progress Rail retained title to the HBI. Progress Rail contends that the retention of title is more akin to a reservation of a security interest but does not take the transaction outside of the application of Article 2.

[12] Progress Rail also argues that the parties' course of conduct demonstrates a history of credit sales. The Court is not persuaded that the parties' prior transactions, none of which have been presented to be under identical or even substantially similar terms, are determinative of the nature of the current Agreement.

[13] An analysis of whether the transaction is a "sale or return" appears necessary in light of the revisions made to the UCC and the corresponding distinction between a consignment and a "sale or return."

12

Debtor removed it from inventory and consumed it in its manufacturing process. This conclusion is supported by paragraph 4 of the Agreement, which only requires Debtor to pay for the HBI it removed from inventory and consumed in its operations. Furthermore, paragraph 11 of the Agreement recognizes that Progress Rail did not sell the HBI that it delivered to Debtor because that clause clearly provides Debtor with the further *option* to "purchase the [HBI] from [Progress Rail] for cash or deliver the [HBI] to [Progress Rail]." If Progress Rail sold the HBI to Debtor and Debtor became the owner of the HBI *upon receiving the HBI* from Progress Rail, the terms providing Debtor with the option to purchase or return the remaining unused inventories of HBI in paragraph 8 would be unnecessary.

A review of the terms of the Agreement also indicates that Progress Rail did not intend for Debtor to own any unconsumed HBI inventory. Progress Rail's reluctance to surrender control over the inventories of HBI possessed by Debtor is most evident under paragraph 11 of the Agreement because that provision states, "[a]t all times, the [HBI] shall be subject to [Progress Rail's] direction and control." Furthermore, the Agreement required Debtor to store all unconsumed HBI inventories in a segregated location from Debtor's other raw material inventories. Moreover, Progress Rail dictated how Debtor consumed the HBI by requiring Debtor to use the HBI on a "first-in-first-out" basis and Progress Rail retained the ability to conduct a physical inventory of unconsumed HBI on any business day of Debtor. Under the Agreement, Progress Rail also had the authority to enter any of Debtor's premises, with or without process of law and without breach of the peace, to repossess HBI inventories and remove them from Debtor's place of business. According to the terms of the Agreement, it is clear that Progress Rail maintained substantial control over all unconsumed HBI inventory in the possession of Debtor. Therefore, with respect to the remaining inventory of HBI in the

13

possession of the Debtor on the Petition Date, all of these factors demonstrate that the Agreement does not create a transfer of ownership or a "sale or return" transaction, or any other indicia of a sale, governed by Article 2 of the Alabama Commercial Code.

### III. PLAIN LANGUAGE OF THE AGREEMENT & OTHER CONSIDERATIONS

Finally, the Court notes that the Agreement between Debtor and Progress Rail is entitled "Consignment Agreement" and is replete with language indicating that the Agreement is a consignment. For instance, the HBI that Progress Rail shipped to Debtor is referred to as "Consigned Goods." Moreover, Debtor is referred to as the "Consignee" and Progress Rail is referred to as the "Consignor" under the terms of the Agreement. It is clear that Debtor and Progress Rail are sophisticated parties that had the ability to make certain that terms used in their Agreement reflected their intent in the nature of their transaction. At the hearing on the competing Motions for Summary Judgment filed by Debtor and Progress Rail, counsel for Progress Rail stated for the record, "we did everything in the world we could to try and make [the Agreement] look like a consignment, Progress Rail did when it drafted it."

Progress Rail's contention that the Agreement does not give rise to a "consignment" governed by the provisions of Article 9 of the UCC is also unconvincing in light of the policy behind the UCC's treatment of consignments. The purpose of § 7-9A-102(a)(20) and § 7-9A-319(a) is to protect creditors of the consignee from claims of consignors that have undisclosed consignment agreements with the consignee that create secret and undisclosed competing interests in the inventory held by a consignee. See In re Valley Media, Inc., 279 B.R. 105, 121 (Bankr. D. Del. 2002)(noting that the purpose of former UCC § 2-326(3) and now revised UCC §§ 9-102(a)(20) & 9-319(a) is to protect general creditors of the consignee from claims of consignors that have undisclosed consignment arrangements with the consignee that create secret

competing interests on the consignee's inventory); In re Morgansen's Ltd., 302 B.R. 784, 784 n. 4 (Bankr. E.D.N.Y. 2003) (same). To recognize the Agreement as some type of consignment beyond the application of Article 9 of the UCC, as adopted under Article 9A of the Alabama Commercial Code, would allow Progress Rail to circumvent the secured transaction provisions adopted by so many states. See also BFC Chemicals, Inc. v. Smith-Douglass, Inc., 46 B.R. at 1018-19 (recognizing that the purpose of former UCC § 2-326 was to eliminate the danger of creditors being misled by the apparent ownership of goods held by consignee); General Electric Credit Corp. v. Strickland Div. of Rebel Lumber Co., Inc., 437 So.2d 1240, 1244 (Ala. 1983)(noting that prior to the adoption of the UCC, courts disfavored all consignments due to a dislike of secret liens); NASCO Equipment Co. v. Mason, 291 N.C. 145, 154, 229 S.E.2d 278, 285 (N.C. 1976) (noting that North Carolina General Statute § 25-2-326(3)(b) (a version of former UCC § 2-326) requires public notice of the rights of a consignor before he is allowed to defeat the interests of creditors and that § 25-2-326(3)(b) provides protection to creditors); Vonins, Inc. v. Raff, 101 N.J. Super. 172, 180, (N.J. Super. Ct. App. Div. 1968)(noting that former UCC § 2-326 as adopted by New Jersey sought to prevent a consignor's ability to secure an advantage over innocent creditors of debtor by use of an ambiguous contract).

Moreover, Progress Rail has not presented sufficient evidence demonstrating that the Agreement is simply a bailment transaction wherein Debtor serves as an agent that provides services to Progress Rail. In Kodak v. Harrison (In re Sitkin Smelting & Refining Inc.), 639 F.2d 1213 (5th Cir. 1981) and First Nat'l Bank of Birmingham v. Young, 530 So.2d 834 (Ala. Ct. App. 1988), the courts in those respective cases declined to apply former § 7-2-326(3) to characterize transactions as consignments on the ground that the transactions were in the nature of bailment agreements. Under Alabama law, bailment is defined as the "delivery of personal

property under agreement that the same property be restored to the person delivering it in the same or altered form." First Nat'l Bank of Birmingham v. Young, 530 So.2d at 838 (quoting Blair v. United States, 164 F.2d 115, 116 (5th Cir. 1947)). In this case, Progress Rail did not deliver the HBI to Debtor to have Debtor return the HBI to Progress Rail in the same or some altered form. As stated earlier, Progress Rail delivered the HBI in order to provide Debtor with an inventory of HBI that Debtor could incorporate into the steel that Debtor manufactured and sold to its customers. Since the facts of this case are distinguishable from the facts in the bailment cases cited above, the Court finds that Progress Rail has not presented sufficient evidence to demonstrate that its transaction with Debtor is outside of the provisions of Article 9A of the Alabama Commercial Code.[14]

## IV.  CONCLUSION

In light of the provisions of the Agreement and the definition of "consignment" provided by ALA. CODE § 7-9A-102(a)(20), the Court determines that the Agreement between Debtor and Progress Rail is a consignment transaction as defined by the provisions of Article 9A of the Alabama Commercial Code.

Therefore, for the reasons set forth hereinabove, it is hereby

**ORDERED** that the Agreement between Debtor and Progress Rail is a consignment transaction pursuant to ALA. CODE § 7-9A-102(a)(20); and it is further

**ORDERED** that in light of Court's characterization of the Agreement, Debtor and Progress Rail shall each submit and serve upon the other the following:

---

[14] Finally, the Court notes the general principle that any ambiguity in a contract must be construed against the drafter of the contract. SouthTrust Bank v. Copeland One, LLC, No. 1020727, 2003 WL 22064062, at *5 (Ala. 2003). Progress Rail admitted that it was the drafter of the Agreement on the record of the hearing. Thus, to the extent any question remains as to the transaction between Debtor and Progress Rail, any ambiguity should be construed against Progress Rail and its argument that the Agreement falls outside of the definition of an Article 9 consignment.

(1) within ten (10) days from the entry of this Order, a proposed order that sets forth the rights and remedies available to each party and addresses which party is entitled to a superior interest in the proceeds generated from the sale of the HBI inventory, and a separate statement as to whether there remains a genuine issue of material fact pertinent to the determination of the rights and remedies available that requires a further hearing and determination; and

(2) one responsive memorandum to the respective proposed orders of the parties within ten (10) days after the submission of the proposed orders to the Court.

**AND IT IS SO ORDERED.**

_____
UNITED STATES BANKRUPTCY JUDGE

Columbia, South Carolina
September 30, 2004