# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

|  |  |  |
|---|---|---|
| IN RE | ) | Chapter 11 |
|  | ) |  |
| GEORGETOWN STEEL COMPANY, LLC, | ) | Case No. 03-13156-W |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
| Georgetown Steel Company, LLC, | ) | Adversary No. 03-80571-W |
|  | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | **ORDER** |
| v. | ) |  |
|  | ) |  |
| Progress Rail Services Corporation, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

**FILED**

_____ O'clock & ____ min ___ M

DEC 0 3 2004

BRENDA K. ARGOE, CLERK
United States Bankruptcy Court
Columbia, South Carolina (I 1)

**ENTERED**

DEC 0 3 2004

**K. E. P.**

THIS MATTER comes before the Court upon cross Motions for Summary Judgment filed by Georgetown Steel Company, LLC ("GSC" or "Debtor") and Progress Rail Services Corporation ("Progress Rail" or "Defendant"). Following entry of this Court's Order determining the nature of the transaction between Debtor and Progress Rail, the parties submitted memoranda concerning each party's entitlement to the proceeds from the sale of the subject collateral. Following consideration of the parties' pleadings, arguments, and the record of the case, the Court makes the following findings of fact and conclusions of law.[1]

---

[1]    The Court notes that to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

## **FINDINGS OF FACT**[2]

1. On October 10, 2003, Debtor and Progress entered into an agreement entitled "Consignment Agreement" (the "Agreement") with respect to a raw material (hot briquetted iron or "HBI") used by Debtor in its steel producing process.

2. During the period between October 10, 2003 and October 20, 2003, Progress Rail delivered HBI to Debtor at its facility in Georgetown, South Carolina as required by the Agreement.

3. Pursuant to the terms of the Agreement, Progress Rail maintained title to the HBI delivered to Debtor. Debtor stored the HBI in a segregated location from its other inventory, and removed and used the HBI from the location on an as-needed basis. The Agreement required that, once a week, Debtor report the HBI usage to Progress Rail and pay Progress Rail for the HBI that it consumed during the prior week.

4. The parties do not dispute that Progress Rail did not file a UCC-1 financing statement to evidence its interest in the HBI in Debtor's possession.

5. The Agreement provided, in Section 8, as follows:

> At any time, upon one (1) day written notice, Consignor [Progress Rail] may terminate the Agreement. If the Agreement is terminated, the Consignee [Debtor] has the option to purchase the Consigned Goods from Consignor for cash or deliver the Consigned Goods to Consignor on a freight prepaid basis to the location specified by Consignor.

6. It is undisputed that on October 20, 2003, Progress Rail sent a written notice to Debtor stating as follows:

> Pursuant to Section 8 of the Consignment Agreement, Progress Rail may terminate the [Agreement] by written notice to Georgetown. Please be advised that Progress Rail terminates the [Agreement] effective October 21, 2003 and that Georgetown is directed to immediately cease and desist the withdrawal of the

---

[2] The Court also references the Findings of Fact set forth in its Order entered September 30, 2004, in the above-captioned adversary proceeding.

Consigned Goods from the Protected Area (as defined in the Consignment Agreement). Please instruct the appropriate Georgetown personnel to cease and desist the withdrawal of the Consigned Goods and the use of such Consigned Goods by Georgetown unless we expressly authorize such withdrawal and use by a subsequent written authorization. We would appreciate your furnishing Progress Rail a complete and accurate inventory of the Consigned Goods as soon as possible.

The letter was sent by Progress Rail's Senior Vice-President to the Senior Vice-President and CFO of Debtor (the "Notice of Termination").

7.      Also on October 20, 2003, Progress Rail sent a written notice demanding reclamation of the HBI.

8.      On October 21, 2003 (the "Petition Date"), at approximately 9:00 a.m., Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Debtor is operating its business and managing its properties as debtor-in-possession pursuant to Sections 1107(a) and 1108 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").[3]

9.      After the Petition Date, Debtor and Progress Rail entered into a Stipulation (the "Stipulation"), which provided for the sale of the HBI in Debtor's possession. Both Debtor and Progress Rail wanted to liquidate the inventory of the HBI because the market price of HBI at that time was high and was expected to decrease in the near future.

10.     Furthermore, the Stipulation provided that this Court would resolve all claims and disputes concerning ownership of the proceeds generated by the sale of the HBI. Moreover, Debtor and Progress Rail also agreed that the sale would not affect any party's interest in the HBI and that any interest in the HBI would attach to the proceeds produced from the sale.

---

[3]      Hereinafter further references to sections will be to the Bankruptcy Code unless otherwise indicated.

11. The HBI was sold in December 2003 pursuant to the terms of the Stipulation. The sale of the HBI generated $1,381,435.01 in proceeds and those proceeds are currently being held in trust pending the outcome of this adversary proceeding.

12. On December 22, 2003, Debtor filed a complaint (the "Complaint") instituting this proceeding and seeking a declaratory judgment that Debtor's interest in the HBI is superior and senior to Progress Rail's interests in the HBI and asserted its rights as a lien creditor pursuant to the Bankruptcy Code.

13. Having established by previous Order that the Agreement is a consignment transaction governed by Article 9 of the Uniform Commercial Code, as adopted by applicable state law, the Court must now determine the rights and remedies of each party, and which party is entitled to a superior interest in the sale proceeds generated from the sale of the HBI.[4]

## SUMMARY OF ARGUMENT

Debtor alleges five causes of action in its Complaint. Debtor's First Cause of Action seeks a declaration from this Court concerning the nature of the Agreement between the parties. This Court has previously ruled that the Agreement is a consignment agreement governed by the provisions of Article 9 of the Uniform Commercial Code (the "UCC"), as adopted by applicable state law. Debtor's Second and Third Causes of Action seek an order determining that Progress Rail's interest in the HBI was not properly perfected. Finally, Debtor's Fourth and Fifth Causes of Action seek avoidance of Progress Rail's alleged unperfected interest pursuant to 11 U.S.C. § 544 and for recovery of the proceeds from the sale of the HBI pursuant to 11 U.S.C. § 550. Debtor contends that its position as a lien creditor pursuant to § 544 is superior to Progress Rail's unperfected interest and that Debtor is thus entitled to the proceeds from the sale of the HBI.

---

[4]     The parties have agreed that there are no genuine issues of material fact for purposes of the issues addressed in this Order.

Debtor relies primarily upon Progress Rail's undisputed failure to file a financing statement

evincing its interest in the HBI as well as its possession of the HBI as consigned goods as of the

Petition Date and its rights to purchase the HBI upon termination of the Agreement.

Progress Rail contends that the Agreement was terminated prepetition and that Debtor

therefore had no rights in the HBI as of the Petition Date.  Moreover, Progress Rail argues that it

held a perfected security interest in the HBI as of the Petition Date.  Finally, or in the alternative,

Progress Rail contends that it is entitled to the proceeds from the sale of the HBI by virtue of its

timely demand for reclamation.  For all of these reasons, Progress Rail asserts that Debtor would

thus not be entitled to assert superior rights in the HBI as a hypothetical lien creditor pursuant to

§ 544.[5]

## CONCLUSIONS OF LAW

**I.     APPLICATION OF ARTICLE 9 AND EFFECT OF PROGRESS RAIL'S
FAILURE TO FILE A FINANCING STATEMENT**

It appears well settled that "[a] consignor must perfect a security interest under Article 9

to protect itself from the consignee's trustee in bankruptcy and from other and later perfected

secured creditors."  White and Summers, Uniform Commercial Code, § 30-4 (5[th] ed., 2002).  See

also S.C. Code Ann. § 36-9-319 (consignee is deemed to have the rights and title to the goods

identical to those consignor had power to transfer; import of provision is that creditors of

consignee can acquire judicial liens and security interests in goods).  The nature of a consignor's

security interest is set forth in § 9-103, which states that "the security interest of a consignor in

---

[5]        The Court notes that the Official Committee of Unsecured Creditors filed a statement in support of
Debtor's Motion for Summary Judgment, asserting that Progress Rail failed to perfect its rights as a consignor and
has failed to establish any rights as a reclaiming seller.

goods that are the subject of a consignment is a purchase-money security interest in inventory."
S.C. Code Ann. § 36-9-103(d).[6]

Since the consignment is deemed to be a security interest under Article 9 of the UCC, the rules of filing and perfection with regard to security interests under Article 9 apply to the consignor's interest in the consigned goods and will determine which party has superior rights in the HBI. S.C. Code Ann. § 36-9-109(a)(4) (stating that Article 9 applies to consignments). In order to perfect its interest, Progress Rail was required to file a financing statement, and it is undisputed that Progress Rail failed to do so.

South Carolina Commercial Code § 36-9-317 provides that a purchase money security interest will take priority over the rights of a buyer, lessee, or lien creditor if a financing statement is filed "before or within 20 days after the debtor receives delivery of the collateral." S.C. Code Ann. § 36-9-317(e).   Since consignments are classified as purchase money security interests, if the consignor fails to perfect its interest in the consigned goods within the relevant time frame, the rights of the consignor in the goods are subordinated to the rights of lien creditors of the debtor. S.C. Code Ann. § 36-9-317(e).  Official Comment No. 5 to § 36-9-317 provides a succinct summary of the rights of consignors and consignees and the impact of the failure of a consignor to perfect its interest in the consigned goods:

> A consignee of goods or a seller of accounts or chattel paper each is deemed to have rights in the collateral which a lien creditor may reach, as long as the competing security interest of the consignor or buyer is unperfected. This is so even though, as between the consignor and the debtor-consignee, the latter has only limited rights, and, as between the

---

[6]       The Agreement provides that it shall be governed by the laws of the State of Alabama.  However, the local law of the jurisdiction in which the collateral is located governs perfection, the effect of non-perfection, and priority issues, thus South Carolina law is applicable with respect to the respective parties' rights to the proceeds.  See Ala. Code § 7-9A-301; S.C. Code Ann. § 36-9-301.  Regardless of which jurisdiction's laws govern, the outcome is the same.

buyer and the debtor-seller, the latter does not have any rights in the collateral.

S.C. Code Ann. § 36-9-317, Official Comment No. 5.

The Uniform Commercial Code further specifically establishes the rights of a consignee and its creditors to the consigned goods. S.C. Code Ann. § 36-9-319(a) provides that:

> [F]or the purposes of determining the rights of creditors of, and purchasers for value of goods from a consignee, while the goods are in the possession of the consignee, the consignee is deemed to have the rights and title to the goods identical to those the consignor had or had power to transfer.

S.C. Code Ann. § 36-9-319(a). Official Comment No. 2 to § 36-9-319 provides that for the purpose of determining the rights of third parties, the consignee is deemed to acquire all the rights of consignor if the consignor's security interest is unperfected. "The consignee acquires these rights even though, as between the parties, it purchases a limited interest in the goods (as would be the case in a true consignment, under which the consignee acquires only the interest of a bailee). As a consequence of this section, creditors of the consignee can acquire judicial liens and security interests in the goods." S.C. Code Ann. § 36-9-319, Official Comment 2.

Progress Rail does not dispute that it failed to file a financing statement, but argues that its failure to file is not dispositive for two reasons. First, Progress Rail contends that it properly terminated the Agreement prepetition, thus it was not necessary for Progress Rail to file a financing statement inasmuch as Debtor no longer had any rights to the HBI. Second, Progress Rail argues that pursuant to § 7-9A-312 of the Alabama Code, its security interest was entitled to priority over certain buyers, lessees and lien creditors as of the filing of the bankruptcy petition. Progress Rail therefore essentially contends that its failure to file a financing statement is not controlling inasmuch as Progress Rail's interest was temporarily perfected pursuant to § 7-9A-

317(e) of the Alabama Commercial Code. Therefore, Progress Rail's security interest would take priority over Debtor as a § 544 hypothetical lien creditor.

### a.    Termination of Agreement

Progress Rail first contends that the Agreement, as allowed by its terms, was terminated prior to the Petition Date pursuant to the Notice of Termination dated October 20, 2003 advising Debtor of termination of the Agreement effective October 21, 2003. Therefore, Debtor no longer had any rights in the HBI and Progress Rail had no obligation to perfect its security interest. Debtor's position is that pursuant to Alabama law, no termination of the Agreement could have been effective prepetition unless it had sent the Notice of Termination to GSC more than 24 hours prior to the 9:00 a.m. filing of the petition.[7] See Strickland v. Alabama Farm Bureau Mutual Casualty Ins. Co., 502 So.2d 349 (Ala. 1987). Further, Debtor argues that the automatic stay prevented Progress Rail from terminating the Agreement.

Whether the Agreement was terminated prepetition may directly implicate who has superior rights to the proceeds from the sale of the HBI. The Court considers state law to determine whether the Agreement has been terminated prepetition. Universal Co-op, Inc. v. FCX, Inc., 853 F.2d 1149 (4th Cir. 1988) ("The existence and nature of a debtor's, and hence the estate's, interest in property must be determined by resort to nonbankruptcy law."); In re Valentin, 309 B.R. 715, 718 n.3 (Bankr. E.D. Pa. 2004) ("'Termination' is a concept that determines the viability of a contract and is a matter of applicable state law."); Staffmark Investment LLC v. Foote (In re Foote), 277 B.R. 393, 396 (Bankr. E.D. Ark. 2002) ("Whether a lease has terminated is a question of state law."); In re Merry-Go-Round Enters., No. 94-5-0161, 1996 WL 69688, at *2 (Bankr. D. Md. 1996) ("Bankruptcy looks to state law to determine property rights, and such a determination would include when a lease is terminated."); Carlisle

---

[7]    There appears to be no dispute that Debtor filed its petition the morning of October 21, 2003.

Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 537 (Bankr. D.N.J. 1988)

(whether option contract had terminated was matter of state law).

The Notice of Termination specifically provided that termination was effective October

21, 2003. However, Progress Rail argues that because the Agreement was terminated on that

date, Debtor had no rights in the HBI on October 21, 2003, the Petition Date, and the HBI never

became property of the estate. Debtor contends that it filed its bankruptcy petition *prior to* the

effectiveness of the Notice of Termination, thus the Agreement was not terminated prepetition.[8]

The Agreement provides that Progress Rail can terminate the Agreement, at any time,

"upon one (1) day written notice." Therefore, it appears necessary to determine, pursuant to state

law, whether the "one (1) day written notice" language contained in the Agreement requires a

twenty-four hour period before termination can be effective. The general rule under Alabama

law is that "in certain cases where time is to be computed from an act done the law refuses to

recognize fractions of a day . . . ." Chadwick v. Colonial Life & Accident Ins. Co, 271 Ala. 457,

459, 124 So.2d 660, 661 (Ala. 1960) (citing Lang v. Phillips, 27 Ala. 311 (1855)).[9]

Nevertheless, this general rule is departed from when considering the priority of judgment liens.

Id. (citing German Security Bank v. Campbell & Co., 99 Ala. 249, 12 So. 436 (Ala. 1893).

Further, the Supreme Court of Alabama has recognized that where it is of importance whether an

act was first done in order to give preference or priority, fractions of a day should be considered.

German Security Bank, 99 Ala. at 436. See also Chadwick, 271 Ala. at 459-60, 124 So.2d at

661-62 (noting that fractions of a day are utilized when justice requires it; applying rule to

consider time when insurance policy expired). Alabama nonbankruptcy law has also recognized

---

[8]        Progress Rail appears to attribute a statement by Debtor that the Notice of Termination "speaks for itself"
in response to a request for admission during discovery as an admission by Debtor that the Agreement was
terminated prepetition. The Court is not convinced that a fair reading of the statement should be read as an implied
admission that the Agreement terminated prepetition.
[9]        As previously noted, the Agreement provides it shall be governed by Alabama law.

that, following a notice of termination that provides a later time period for effectiveness pursuant to an agreement, parties remain obligated under that agreement during the time period prior to the effective date of termination. Food Serv. Dist., Inc. v. Barber, 429 So.2d 1025, 1028 (Ala. 1983). See also Strickland, 502 So.2d at 352 (termination of a contract is effective at the end of the prescribed period). Accordingly, inasmuch as the Court is ultimately determining the priority of the parties' rights to the HBI, the termination of the Agreement was not effective as of the filing of Debtor's bankruptcy petition pursuant to Alabama law.

An analysis of bankruptcy law is consistent with the determination that the Agreement was still in effect as of the bankruptcy filing. Progress Rail cites as support for its position a line of cases that stand for the proposition that where a contract has no applicable cure period and a termination notice thereunder is given, to become effective in the future, the filing of a bankruptcy petition does not stop the running of the time period nor does it prevent the termination of the contract. See e.g., Moody v. Amoco Oil Co., 734 F.2d 1200 (7th Cir. 1984); In re Anne Cara Oil Co., 32 B.R. 643 (Bankr. D. Mass. 1983). However, a close review reveals that the analysis provided in those cases is not controlling with respect to the relief sought herein.

Perhaps the most widely cited case on the issue of a prepetition notice of termination is Moody v. Amoco Oil Co., 734 F.2d 1200 (7th Cir. 1984). In Moody, the court considered the impact of termination notices that were to be effective ninety days from the date of the notice. The debtor filed bankruptcy prior to the expiration of the ninety-day period and argued that the contract was still executory at the time of filing and thus assumable. The Seventh Circuit ruled that the fact that termination was not effective for ninety days was not determinative. Inasmuch as the filing of the petition does not expand the debtor's rights, there was nothing left for debtor to assume. However, it appears well settled that termination must be complete and not subject to

reversal. Id. at 1212. In Moody, since there was no cure provision, and state law did not provide

for such a period, there was no further action that could be taken to prevent termination of the

contracts. Id. Other courts have followed the same line of reasoning. See e.g. In re Diversified

Washes, Inc., 147 B.R. 23, 27 (Bankr. S.D. Ohio 1992); Pyramid Operating Authority, Inc. v.

City of Memphis (In re Pyramid Operating Authority, Inc), 144 B.R. 795, 811 (Bankr. W.D.

Tenn. 1992); Lipscomb Farms, Inc. v. Michigan Millers Mut. Ins. Co. (In re Lipscomb Farms,

Inc.), 90 B.R. 422 (Bankr. W.D. Mo. 1988); Shell Oil Co., Inc. v. Anne Cara Oil Co., Inc. (In re

Anne Cara Oil Co., Inc.), 32 B.R. 643 (Bankr. D. Mass.1983).   See also In re Greenville

American Ltd., No. 00-00721, 2000 WL 33710874 (Bankr. D.S.C. Mar. 24, 2000) (citing Moody

and determining that lease upon which notice of termination had been sent prepetition could not

be assumed).

While this line of reasoning defeats Debtor's argument that the automatic stay of § 362

intervened to prevent the postpetition termination of the Agreement,[10] it is inapposite to the facts

of this case because none of the cases cited by Progress Rail address Debtor's argument that its

rights as a hypothetical lien creditor arose prior to the effective termination of the Agreement and

that Debtor is thus entitled to avoid Progress Rail's security interest in the HBI. Moody and its

progeny address the assumability of executory contracts pursuant to § 365 and consistently

provide that the filing of a bankruptcy petition will not expand a debtor's rights under a contract

set to expire by the passage of time pursuant to a prepetition notice of termination, absent any

applicable cure period. These courts consider that the contracts are either not assumable under §

365, or are only assumable for the short time period prior to the effective date of termination. In

any event, while these cases hold that there is nothing left for the debtor to assume following a

---

[10]      See generally Moody v. Amoco Oil Co., 734 F.2d 1200, 1212-1213 (7th Cir. 1984) (bankruptcy filing will
not prevent termination of contract by tolling running of time).

prebankruptcy notice of termination, absent a cure provision, they also appear to hold that the

parties still hold certain rights under the relevant agreement until termination is effective.[11]

Moody, 734 F.2d at 1213 ("When the termination notice was sent, debtors only had a right to

ninety days worth of dealership contracts."); In re Diversified Washes, Inc., 147 B.R. 23, 27

(Bankr. S.D. Ohio 1992) (once notice of termination was issued prepetition, debtor in possession

had only ten days of franchise rights as of the date of filing).

      In the matter before the Court, Progress Rail provided notice of termination on October

20, 2003, one day prior to its effectiveness and one day prior to Debtor's bankruptcy filing.

While Debtor's bankruptcy filing and the operation of § 362 did not toll the running of time

pursuant to the Notice of Termination, at the time of Debtor's filing, termination was not yet

effective for the reasons stated above, and Debtor still had rights under the Agreement.[12]

Further, § 544 plainly states that the strong arm powers of the trustee or debtor in possession are

applied at the time of commencement of the case.  11 U.S.C. § 544(a) (emphasis added).[13]   The

phrase "at the time of commencement of the case" has been interpreted as at the exact moment of

filing.  As such, at the time of filing, the trustee or debtor in possession is invested with all of the

---

[11]     The parties do not appear to argue that the Agreement was an executory contract.

[12]     Debtor also had the option of purchasing the HBI upon termination pursuant to Section 8 of the Agreement.

[13]     Section 544(a) provides:

(a)     The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the
trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or
any obligation incurred by the debtor that is voidable by --

    (1)     a creditor that extends credit to the debtor at the time of the commencement of the case, and that
obtains, at such time and with respect to such credit, a judicial lien on all property on which a
creditor on a simple contract could have obtained such a judicial lien, whether or not such a
creditor exists;

    (2)     a creditor that extends credit to the debtor at the time of the commencement of the case, and
obtains, as such time and with respect to such credit, an execution against the debtor that is
returned unsatisfied at such time, whether or not such a creditor exists; or

    (3)     a bona fide purchaser of real property, other than fixtures, from the debtor, against whom
applicable law permits such transfer to be perfected, that obtains the status of a bona fide
purchaser and has perfected such transfer at the time of the commencement of the case, whether or
not such a purchaser exists.

powers of a perfected lien creditor or purchaser for value pursuant to § 544(a). See North Lily

Mining Co. v. Keystone Surveys, Inc. (In re North Lily Mining Co.), 289 B.R. 1, 3 n.2 (Bankr.

D. Colo. 2002) (noting that debtor would prevail under § 544 as a hypothetical bona fide

purchaser over an unperfected mortgagee at the moment of a debtor's bankruptcy filing); In re

Bonner, 206 B.R. 387, 388 (Bankr. E.D. Va. 1997) ("either trustee or the debtor is deemed to

have exercised the hypothetical lien creditor's rights at the time of filing"); In re Universal

Trend, Inc., 114 B.R. 936, 942 (Bankr. N.D. Ohio 1990) (trustee obtains all powers of perfected

lien creditor at moment of filing).    See also Peter V. Pantaleo, Practising Law Institute

Commercial Law and Practice, No. A4-4376, 614 PLI/Comm 7, 23 (Apr. – May 1992) ("The

Code puts the Trustee or DIP in the same position as any judicial lien creditor or purchaser for

value from the moment of filing.").    Accordingly, termination of the Agreement was not

effective at the time Debtor filed its petition, and the Court is not convinced that the Notice of

Termination, and the line of cases cited by Debtor, operates to cutoff Debtor's rights as a

hypothetical lien creditor pursuant to § 544.[14]

   **b.    Temporary Perfection**

   As previously noted, Progress Rail alternatively contends that it was perfected at the time

of Debtor's bankruptcy filing. As previously noted, inasmuch as the local law of the jurisdiction

in which the collateral is located governs perfection, the effect of non-perfection, and priority

issues, South Carolina law is applicable with respect to the parties' rights to the proceeds. See

Ala. Code § 7-9A-301; S.C. Code Ann. § 36-9-301.    Regardless of which jurisdiction's laws

govern, the outcome is the same. S.C. Code § 36-9-317(e) provides as follows:

   (e)    Except as otherwise provided in Sections 36-9-320 and 36-9-321, if a
   person files a financing statement with respect to a purchase-money security
   interest before or within twenty days after the debtor received delivery of the

---

[14]    Application of Debtor's § 544 rights will be addressed hereinafter.

collateral, the security interest takes priority over the rights of a buyer, lessee, or lien creditor which arise between the time the security interest attaches and the time of filing.

S.C. Code Ann. § 36-9-317(e). <u>See also</u> Ala. Code § 7-9A-317(e) (same).

Progress Rail's argument with respect to temporary perfection, however, is not persuasive. The language of § 36-9-317(e) is contrary to the position taken by Progress Rail. Section 9-317(e) provides for priority of a security interest over the rights of a lien creditor *if* a financing statement is filed with respect to a purchase-money security interest before or within twenty days after delivery. This Progress Rail did not do, therefore its ability to take advantage of the retroactive priority granted a holder of a purchase-money security interest was never triggered.

The Tenth Circuit has directly addressed Progress Rail's argument and held contrary to its position. <u>Clark v. Valley Fed. Savings and Loan Ass'n (In re Reliance Equities, Inc.)</u>, 966 F.2d 1338, 1343-44 (1992). In <u>Reliance Equities</u>, a creditor asserted that its temporarily perfected status under the applicable commercial code continued indefinitely once bankruptcy proceedings had begun. The creditor never filed a financing statement with respect to certain proceeds, but argued that since it was temporarily perfected as of the petition date, its perfected interest continued because the bankruptcy petition was filed during that period. The Tenth Circuit disagreed and concluded that freezing priorities "upon the initiation of insolvency proceedings would contravene one of the principal purposes of the Bankruptcy Reform Act: to strike down secret liens." 966 F.2d at 1343 (citing <u>In re Arnett</u>, 731 F.2d 358, 363 (6th Cir. 1984)).[15]

---

[15]    The temporary perfection statute examined in <u>Reliance</u> provided that a security interest in proceeds is a continuously perfected interest if the interest in the original collateral was perfected, but ceases to be perfected and becomes unperfected ten (10) days after receipt unless the security interest is perfected within that ten-(10) day period. <u>Reliance Equities</u>, 966 F.2d at 1342-43; Colo. Rev. Stat. § 4-9-306(3) (revised by Colo. Rev. Stat. § 4-9-

Likewise, the argument that temporarily perfected security interests remain forever perfected at the time of a bankruptcy filing has been rejected by recent authority. See Expeditors Int'l v. Liquidating Trust (In re Schwinn Cycling and Fitness, Inc.), 313 B.R. 473, 477-78 (D. Colo. 2004); Forker v. American Honda Fin. Corp. (In re Custer), No. 02-9100, 2003 WL 1807137 (Bankr. N.D. Iowa 2003). In Expeditors, the court applied the analysis set forth in Reliance Equities to a transaction under revised Article 9 and found that the conclusion reached by the Tenth Circuit is not altered by those revisions. The reasoning of those cases holds the same force with respect to Article 9's purchase-money security interest "retroactive" perfection statute. In re Custer, 2003 WL 1807137. In Custer, the court recognized that had the holder of a purchase-money security interest filed a financing statement within the twenty (20) days provided by statute, timely perfection would have been effective against the trustee asserting its § 544 powers and would have related back to the date of attachment. Id. at *3. Since the debtor filed for bankruptcy protection during that twenty-day period, and the creditor never filed a financing statement, the creditor's interest was subordinate to the trustee's status as a hypothetical lien creditor. Id.

Commentators have also recognized § 9-317(e) as a "relation back" statute that permits a creditor to achieve priority over an intervening lien creditor by the filing of a financing statement as provided therein. White & Summers, Uniform Commercial Code, § 32-3 (5th ed., 2002 & Supp. 2004) (citing In re Custer and noting that the timely filing of a financing statement pursuant to § 9-317(e) would permit security interest to relate back and take priority); Barkley Clark & Barbara Clark, The Law of Secured Transactions under the Uniform Commercial Code ¶ 7.06[2] (Sept. 2004), Westlaw, SECTRUCC ¶ 7.06[2] (noting that nothing in revised Article 9

---

315).    The Court notes that the language of the South Carolina statute regarding perfection of a purchase-money security interest is even more restrictive in that a plain read of the statute states that the priority granted for twenty (20) days following delivery only arises if the financing statement is filed.    S.C. Code Ann. § 36-9-317(e).

would excuse a creditor from filing before the end of a 20-day grace period and citing with favor

Reliance Equities).

In the matter before the Court, Debtor's bankruptcy filing did not prevent Progress Rail

from filing a financing statement to ensure its interest was perfected. See 11 U.S.C. § 362(b)(3).

Accordingly, Progress Rail never having filed a financing statement with respect to its interest in

the HBI, it was not temporarily perfected on the Petition Date.   The Court has already

determined, for the reasons previously stated, that the termination of the Agreement was not

effective prepetition, and Progress Rail did not convince the Court that the Notice of Termination

acts to cutoff any rights Debtor has pursuant to § 544 at the time of filing.   Therefore, the Court

will determine whether Debtor's rights as a hypothetical lien creditor, analyzed at the moment of

filing, are superior to Progress Rail's unperfected interest in the HBI.

## II.    11 U.S.C. § 544

Section 544(a), frequently referred to as the "strong arm clause", provides that the trustee

is entitled to avoid any transfer of property that is avoidable under state law by: (i) a perfected

judicial lien creditor, whether or not any such creditor exists; (ii) a creditor with an execution

returned unsatisfied, whether or not any such creditor exists; and (iii) a bona fide purchaser of

real property, whether or not any such purchaser exists.   Under § 544(a), a trustee may take the

identity of a hypothetical entity that could, under state law, defeat a claimed interest in the

debtor's property. Greenville Plaza Investors Ltd. v. Corporate Real Estate Service, Inc. (In re

Greenville Plaza Investors Ltd.), No. 696-2200, 1998 WL 230851, at **1 (Bankr. D.S.C. May

11, 1998).  GSC, as debtor in possession, has the same rights and powers as a trustee. Id.; 11

U.S.C. § 1107(a).

While federal law provides the trustee with § 544 "strong-arm" powers pursuant to § 544, state law controls the exercise of those powers. Crestar Bank v. Neal (In re Kitchin Equip. Co.), 960 F.2d 1242, 1245 (4th Cir. 1992). Which state law controls is not always clear when more than one jurisdiction is involved. Nevertheless, most courts often apply the law of the situs of the subject property. United States v. FHA (In re MSC, Inc.), 54 B.R. 650, 652 (Bankr. D.S.C. 1985) ("The validity, nature, and effect of liens are governed by the law of the state where the property is situated."); Lawrence Ponoroff and Stephen E. Snyder, COMMERCIAL BANKRUPTCY LITIGATION, § 10:2 (Current through May 2004) ("bankruptcy courts have most often simply applied the law of the situs of the property as of the time of the commencement of the case."). Accordingly, since the HBI was located in South Carolina as of the commencement of the case, the Court will examine South Carolina law to determine the extent of the application of Debtor's § 544 powers in this case. See also Butner v. United States, 440 U.S. 48, 54 (1979) (nature and existence of debtor's interest in property is determined by applicable state law).

In order to successfully apply a debtor's rights as a judgment lien creditor pursuant to § 544(a), there must be some interest to which the judgment lien could attach. 5 COLLIER ON BANKRUPTCY, ¶ 544.02 at 544-4 (15th ed. Rev.) ("The trustee cannot use the "strong arm" powers if the threshold requirement that the debtor must have an interest in the property is not met."). Therefore, if Debtor has no interest in the HBI, a judgment lien could not attach to the HBI and § 544(a) would not defeat Progress Rail's interest in its goods. However, if at the time of filing, the Agreement was still effective, Debtor's rights under the Agreement, as a consignment agreement governed by Article 9, would be controlled by Article 9's perfection and priority provisions as adopted in South Carolina.[16]

---

[16]    The Court notes that Debtor was still in possession of the HBI at the time of filing pursuant to the Agreement.

17

As a consignor with an unperfected interest in the HBI, the rights of Progress Rail in the HBI are junior and subordinate to the rights of lien creditors and the debtor-in-possession pursuant to § 544. White & Summers, § 30-4. This outcome is consistent with the limited case law under new revised Article 9 and the pre- revision treatment of consignments, both of which are designed to discourage secret liens.

There are very few cases interpreting revised Article 9. However, the intent of the revised statute was discussed at some length in In re Valley Media, Inc., 279 B.R. 105 (Bankr. D. Del. 2002). In that case, the court held that a consignor with an unperfected security interest in the goods pursuant to Article 9 would not "prevail over a trustee exercising its powers pursuant to 11 U.S.C. § 544(a)." In re Valley Media, Inc., 279 B.R. at 132.

In Valley Media, the debtor sought authorization to sell certain inventory of the debtor in the form of copyright-licensed recordings and DVDs, etc., over the objection of the consignors. Id. at 112. The inventory in question was in the possession of the debtor pursuant to consignment agreements which provided that the title to the inventory remained with the seller/vendor and the goods were not paid for and title did not transfer until the debtor/distributor sold the specific piece of inventory. Id. at 114-117. None of the consignment vendors had filed valid financing statements. Id. at 124.

The court in Valley Media found that the purpose of § 9-102(a)(20) and § 9-319(a) is to "protect creditors of the consignee from claims of consignors that have undisclosed consignment agreements with the consignee that create secret liens on the inventory." Id. at 125. While specifically stating that as between the consignor and the consignee, § 9-102(a)(20) and § 9-319(a) did not vest title to the contested inventory in the debtor, the court stated that under the UCC, if an agreement is a consignment agreement under § 9-102(a)(20), then § 9-319(a) would

18

apply, allowing the consignee's creditors to attach the consigned goods as if the consignee actually had title to the goods. Id. at 123. The consignor may protect itself from this outcome by either (i) perfecting its security interest as a purchase money security interest and filing a financing statement; or (2) by otherwise falling outside the definition of a consignment.[17] Id. See also ATG Aerospace, Inc. v. High-Line Aviation Ltd. (In re High-Line Aviation, Inc.), 149 B.R. 730 (Bankr. N.D. Ga. 1992).

Accordingly, based on S.C. Code § 9-317 and § 9-319, this Court finds that Progress Rail's interest in the HBI is an unperfected security interest, subordinated to the interests of buyers, lessees, or lien creditors. Pursuant to § 544, GSC, as a debtor in possession, has the rights and powers of a judicial lien creditor at the time of the commencement of the case, whether or not such creditor exists. 11 U.S.C. § 544(a). Debtor may use this power to avoid unperfected security interests and unperfected liens to the extent a judgment creditor may do so under non-bankruptcy law. Further, Debtor also has the authority to recover for the benefit of the estate any transfer so avoided pursuant to § 550.[18] Therefore, as a hypothetical lien creditor under § 544, Debtor has a superior interest in the HBI and takes priority over Progress Rail as the consignor. "While a consignor that failed to protect its interest under . . . revised UCC § 9-102(a)(20) might prevail over a secured creditor of the consignee who had actual knowledge of the consignment, that consignor will not prevail over a trustee exercising its powers pursuant to 11 U.S.C. § 544(a)." In re Valley Media, Inc., 279 B.R. at 132; See White & Summers, §30-4.

---

[17] The Court in Valley Media, with little analysis, carved out the applicability of its decision with respect to consignors whose consignment agreement had completely terminated prepetition. Inasmuch as termination of the Agreement in the matter before the Court was not effective at the time of the filing of Debtor's bankruptcy petition, the holding in Valley Media with respect to terminated consignment agreements is inapplicable. 279 B.R. at 142-43.

[18] Section 550 provides that the trustee may recover, for the benefit of the estate, certain property transferred, or the value of such transferred property. 11 U.S.C. § 550.

In this case, Progress Rail failed to perfect its interest under the Agreement in the HBI because Progress Rail did not file a financing statement as required under the Uniform Commercial Code. Therefore, Progress Rail's security interest in the HBI is an unperfected security interest, subject to the rights of creditors, avoidable by Debtor pursuant to its strong-arm powers under § 544, and recoverable for the benefit of Debtor's estate pursuant to § 550. See In re Valley Media, Inc., 279 B.R. at 132.

## III.    RECLAMATION

Progress Rail maintains that regardless of the nature of the transaction, it is entitled to exercise its right of reclamation under Article 2 of the Alabama Commercial Code. Debtor has conceded that the reclamation demand was timely made pursuant to the UCC and the Bankruptcy Code, but maintains that reclamation is not available to Progress Rail under the facts of this case.

This Court has previously ruled in its Order determining the nature of the Agreement that the transaction "does not create a transfer of ownership or a 'sale or return' transaction, or any other indicia of a sale, governed by Article 2 of the Alabama Commercial Code." Reclamation is a remedy afforded to unsecured sellers who transfer title to goods on the eve of bankruptcy under Article 2 of the UCC. Since this transaction is not a sale or other transaction under Article 2 of the UCC but rather is a consignment and security interest under Article 9 of the UCC, the reclamation remedy for sellers under Article 2 is not available to Progress Rail. To hold otherwise would allow Progress Rail to circumvent the requirements of Article 9 with respect to the consignment transaction into which it entered.

The purpose of Article 9 and a review of limited case law on this issue support the conclusion that reclamation is not available to Progress Rail based on the facts of this case. If a consignor was able to exercise a right of reclamation and recover goods despite its failure to

perfect its interest in the goods as required by the UCC, the perfection provisions of Article 9 and

the rights granted to creditors of the consignee pursuant to S.C. Code §§ 9-317, 9-319 would be

rendered meaningless.   "The pre-code law was that a consignor could generally reclaim the

goods against the consignee's creditors (and trustee). [citations omitted.]  Now, however, if an

insolvent consignee 'maintains a place of business at which he deals in goods of the kind

involved . . .', the goods in his possession become subject to the claims of his creditors absent

compliance with one of the three exceptions."  Newhall v. Haines, 10 B.R. 1019 (D. Montana

1981).  In  Quaker City Iron Works, Inc. v. Ganz (In re Wicaco Machine Corp.), 49 B.R. 340

(E.D. Penn. 1984), the court found that under the requirements of former 2-326 (the predecessor

to § 9-102(a)(20)), the consigned goods were subject to the claims of the debtor's creditors.  Id.

at 343.  Since the goods in question were subject to the interests of creditors, the court denied

reclamation as to the consigned goods.  Id. at 344.  See also Star Furniture Warehouse, Inc. v.

Marcoly (In re Marcoly), 32 B.R. 423 (Bankr. W.D. Pa. 1983) (court denied reclamation of

claimant that had not perfected its security interest in consigned goods; secured creditor had

superior interest).[19]

     The intention of the drafters of the UCC appears clear on this point.  The scope of Article

9 covers secured transactions and consignments.  S.C. Code Ann. § 36-9-109.  Since this Court

has previously found that the transaction evidenced by the Agreement is not a sale, but is a

---

[19]      The Court notes that it is generally recognized that § 544 alone does not operate to defeat reclamation by
reliance of a debtor or trustee on hypothetical lien creditor rights.  See David G. Epstein et al., Bankruptcy § 6-64, at
144 (West 1992).  The effect of a right of reclamation is to give the seller a nonconsensual lien on goods.  Id.
Accordingly, given that the powers of a debtor in possession are limited with respect to reclamation pursuant to
§ 546, it appears logical that a debtor in possession cannot assert its § 544 powers to avoid this "nonconsensual lien"
in each instance a seller asserts valid reclamation rights under state law.  However, based on the facts of this case,
the Agreement was governed by Article 9, which required perfection of Progress Rail's interest in the HBI.  Debtor
is not utilizing § 544 to defeat Progress Rail's right of reclamation – Progress Rail simply does not have such a right
in this instance.

consignment covered under Article 9, the rights of the parties are necessarily controlled by the priorities set forth in Article 9 of the UCC.

This is supported by the rationale for allowing reclamation to sellers under Article 2. Historically, the right of reclamation was granted to unsecured sellers as a remedy where the seller discovers the buyer received goods on credit while insolvent. See David G. Epstein et al., Bankruptcy § 6-63, at 143 (West 1992) (citing U.C.C. § 2-702(2)). Thus, reclamation appears to be a remedy designed to protect the innocent, unknowing seller who is without knowledge of the financial condition of the buyer. In this case, Progress Rail is not an unsecured seller but is a consignor with a security interest that is subject to the rights of creditors under Article 9. Progress Rail is not an unsophisticated player in the steel industry; it specifically structured the transaction as a consignment, not a sale. Having voluntarily elected to take itself out of the realm of Article 2 sales, Progress Rail cannot now utilize the remedies created for sellers, at the expense of the creditors of Debtor, in order to correct its failure to file a financing statement. For these reasons, the Court finds that because Progress Rail is a consignor with an unperfected security interest in the HBI, based on the facts of this case, Article 9 governs the priorities of the parties, and Progress Rail may not exercise a right of reclamation

## IV.   **CONCLUSION**

Based on the applicable provisions of Article 9 of the UCC relating to the perfection and priorities of consignment agreements, the Court holds that Progress Rail has an unperfected security interest in the HBI, which interest is subordinate to the rights of Debtor's creditors, and is avoidable by Debtor and recoverable for the benefit of the estate pursuant to § 544 and § 550 of the Bankruptcy Code.[20] Therefore, for the reasons set forth hereinabove, and there being no

---

[20]    Inasmuch as Debtor has succeeded on its summary judgment motion to the extent set forth herein, and the Court has determined that the Notice of Termination did not operate to eliminate Debtor's § 544 rights at the time of

genuine issue of material fact, it is hereby

**ORDERED** that Debtor's Motion for Summary Judgment is granted to the extent herein; and it is further

**ORDERED** that Progress Rail's Motion for Summary Judgment is denied; and it is further

**ORDERED** that Debtor, as a hypothetical lien creditor pursuant to § 544 of the Bankruptcy Code, has a senior and superior interest in the proceeds of the HBI over the interests of Progress Rail, and that Debtor is entitled to recovery pursuant to § 550; and it is further

**ORDERED** that Progress Rail does not have any right of reclamation as to the HBI or its proceeds; and it is further

**ORDERED** that the proceeds of the sale of the HBI shall be delivered to Debtor within ten (10) days of the date of this Order; and it is further

**ORDERED** that this Complaint having been fully determined, the Adversary Proceeding can be closed.


**AND IT IS SO ORDERED.**

_John EWaites_
United States Bankruptcy Judge

Columbia, South Carolina
December 3 , 2004

---

filing, the Court need not consider Debtor's remaining arguments, including that it had remaining rights under the Agreement by virtue of the option to purchase upon termination and due to its continuing possession of the HBI.